FILED

2011 Dec-02  PM 01:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ANDREWS SPORTS MEDICINE &** | ) | |
| **ORTHOPAEDIC CENTER, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. _____** |
| | ) | |
| **JOHN WARD CORY, M.D.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Andrews Sports Medicine & Orthopaedic Center, LLC ("ASMOC" or "Plaintiff") hereby serves the following Complaint against John Ward Cory, M.D. ("Dr. Cory" or "Defendant").

## THE PARTIES

1.      ASMOC is a limited liability company organized under the laws of the State of Alabama.  All of ASMOC's members are adult individuals, each of whom are citizens of the State of Alabama.

2.      Dr. Cory is an adult individual and citizen of the State of Arizona.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are diverse and the amount-in-controversy exceeds the minimum required under § 1332.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in the complaint occurred in this district and Dr. Cory is subject to personal jurisdiction in this district.

5.     Furthermore, by executing the Loan Agreement (as hereafter defined), Dr. Cory authorized ASMOC to bring this action in this district, and waived any objection to jurisdiction or venue in this district.

## FACTUAL BACKGROUND

### A.   Dr. Cory's Employment Agreement With ASMOC.

6.     On September 8, 2009, ASMOC and Dr. Cory entered into an employment agreement for a position with ASMOC (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

7.     Both Dr. Cory and ASMOC participated in the negotiation, which was extensive, and drafting of the Employment Agreement. *See* Employment Agreement, ¶ 16.

8.     The Employment Agreement was for an initial term of one (1) year and was to automatically renew each year for a one (1) year term unless terminated by ASMOC or Dr. Cory. *See* Employment Agreement, ¶ 1. Dr. Cory was an employee of ASMOC, and, per the terms of the Employment Agreement, was not guaranteed employment past the initial term or eventual membership in ASMOC.

9.     Indeed, the Employment Agreement represents the entire agreement between ASMOC and Dr. Cory and does not guarantee future employment or membership. *See* Exhibit B, ¶¶ 1, 16-18.

10.    Dr. Cory violated the Employment Agreement by, among other things, failing to repay funds owed under the Loan Documents (as hereafter defined).

**B.**     **Dr. Cory's Loan Obligations.**

11.     Under Schedule 4.3 of the Employment Agreement, ASMOC agreed to assist Cory in establishing a line of credit at a mutually-agreeable financial institution in order to provide advances to Cory against future earnings. *See* Employment Agreement, Schedule 4.3 thereto.

12.     ASMOC fulfilled its obligations under Schedule 4.3 of the Employment Agreement by assisting Dr. Cory in establishing a line of credit with Oakworth Capital Bank ("Oakworth").

13.     Oakworth made available to Dr. Cory a line of credit in the maximum principal amount of $500,000.00 (as renewed, modified, amended and/or revised from time to time, the "Credit Line").

14.     The Credit Line is evidenced by that certain *Business Loan Agreement* dated October 8, 2009, between Dr. Cory and Oakworth (the "Loan Agreement").  A copy of the Loan Agreement is attached hereto as **Exhibit B** and is incorporated herein by reference.

15.     The Credit Line is further evidenced by that certain *Commercial Line of Credit Agreement and Note* (the "Note," and together with the Loan Agreement, the "Loan Documents") dated October 8, 2009, executed and delivered by Dr. Cory to Oakworth.  A copy of the Note is attached hereto as **Exhibit C** and is incorporated herein by reference.

16.     ASMOC and two of its members were forced to guarantee the Credit Line in order for Oakworth to agree to extend credit to Dr. Cory.

17.     The Note matured by its terms on October 8, 2010 (the "Maturity Date").

18.     In order to avoid having the loan be past due, and possibly harm ASMOC as guarantor, ASMOC purchased Dr. Cory's loan from Oakworth.  On October 27, 2010, Oakworth executed that certain *Assignment of Loan Documents* (the "Assignment"), whereby Oakworth

3

assigned all of its right, title, and interest in and to the Loan Documents to ASMOC.  A copy of the Assignment is attached hereto as **Exhibit D** and is incorporated herein by reference.

19.     ASMOC holds the Loan Documents and owns the indebtedness evidenced thereby.

20.     By executing the Loan Documents, Dr. Cory agreed to pay all of ASMOC's costs and expenses, including ASMOC's attorneys' fees, incurred in connection with the enforcement of the Loan Documents.

21.     ASMOC and its predecessor-in-interest complied with their contractual obligations under the Loan Documents by, *inter alia*, lending funds to Dr. Cory.

22.     As the Note has matured, Dr. Cory is obligated to make a final payment in full of all amounts due and owing thereunder to ASMOC.

23.     Despite maturity of the Note, Dr. Cory has failed to make payment of all amounts due under the Loan Documents.  Dr. Cory's failure to pay his obligations under the Loan Documents in full constitutes an Event of Default under the Loan Documents that has not been cured and is continuing

<u>**COUNT ONE - BREACH OF CONTRACT**</u>
<u>**(EMPLOYMENT AGREEMENT)**</u>

24.     ASMOC hereby adopts, restates, and re-alleges paragraphs 1-23 above as if fully set forth herein.

25.     ASMOC and Dr. Cory entered into the Employment Agreement, which constitutes a lawful, valid, and binding contract between them.

26.     ASMOC performed all of its obligations under the Employment Agreement.

27.     Dr. Cory breached the Employment Agreement by failing to meet his obligations thereunder, including, among other things, by failing to repay all amounts owed under the Loan Documents.

28.     As a direct, proximate, and foreseeable result of Dr. Cory's breach of the Employment Agreement as described herein, ASMOC has been injured and damaged, and will continue to suffer such injuries and incur such damages.

WHEREFORE, ASMOC requests that this Court enter a judgment in favor of ASMOC and against Dr. Cory, and award compensatory, equitable, legal, and other relief to which it may be entitled, including, but not limited to, court costs and interest.

## COUNT TWO - BREACH OF CONTRACT
## (CREDIT AGREEMENT)

29.     ASMOC hereby adopts, restates, and re-alleges paragraphs 1-23 above as if fully set forth herein.

30.     Oakworth and Dr. Cory entered into the Loan Documents, which constitute lawful, valid, and binding contracts between them.

31.     Oakworth assigned all of its right, title, and interest in the Loan Documents to ASMOC.   ASMOC is the holder of, and owns the indebtedness evidenced by, such Loan Documents.

32.     ASMOC and its predecessor-in-interest performed all of their obligations under the Loan Documents.

33.     Dr. Cory breached the Loan Documents by failing and/or refusing to repay all amounts owing thereunder.

5

34.     As of December 1, 2011, the total due under the Loan Documents, exclusive of attorneys' fees and costs, is $193,024.47.  Interest continues to accrue under the Loan Documents as set forth therein.

WHEREFORE, ASMOC requests that this Court enter a judgment in favor of ASMOC and against Dr. Cory in the amount of $193,024.47, plus accruing interest, plus post-judgment interest, plus attorneys' fees, plus costs, and for such other, further, and different relief as this Court deems just and proper under the circumstances.

### COUNT THREE - UNJUST ENRICHMENT

35.     ASMOC hereby adopts, restates, and re-alleges paragraphs 1-13 above as if fully set forth herein.

36.     Oakworth and ASMOC took the actions described herein, and expended the sums described herein, based on the belief that Dr. Cory desired, wanted, and intended that Oakworth and ASMOC take such actions on his behalf, and with the understanding that Oakworth and ASMOC would be reimbursed and paid by Dr. Cory for such actions.

37.     Dr. Cory has received money that in equity and good conscience should be returned to ASMOC.

38.     Dr. Cory has been unjustly enriched at the expense of, and to the detriment of, ASMOC.

39.     ASMOC has been damaged as a result of Dr. Cory's failure to pay and is entitled to recover from Dr. Cory the amount of $193,024.47, plus accruing interest and other legally recoverable costs and expenses.

WHEREFORE, ASMOC requests that this Court enter a judgment in favor of ASMOC and against Dr. Cory in the amount of $193,024.47, plus accruing interest, plus post-judgment

6

interest, plus attorneys' fees, plus costs, and for such other, further, and different relief as this

Court deems just and proper under the circumstances.

Dated: December 1, 2011.

_____

Ed Hardin (HAR097)
D. Christopher Carson (CAR599)

Attorneys for Plaintiff
ANDREWS SPORTS MEDICINE & ORTHOPAEDIC
CENTER, LLC

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
ehardin@burr.com
ccarson@burr.com

**EXHIBIT A**

## EMPLOYMENT AGREEMENT

**THIS AGREEMENT** (this "*Agreement*") is made and entered into effective the 8th day of September 2009 (the "*Effective Date*"), by and between Andrews Sports Medicine and Orthopaedic Center, LLC, an Alabama limited liability company (the "*Company*"), and John Ward Cory, M.D. (the "*Employee*").

## RECITALS:

The Company provides professional medical services through its employees who are duly licensed to practice medicine in the State of Alabama. The Employee is a physician duly licensed to practice medicine in the State of Alabama. The Company desires to employ the Employee and the Employee desires to accept such employment upon the terms and conditions set forth herein.

## AGREEMENT

In consideration of the premises and the mutual covenants set forth below, the parties agree as follows:

1.  <u>Term.</u> (a)    The Employee's employment shall commence on the Effective Date and shall continue for an initial period of one (1) year (the "*Initial Term*"). This Agreement shall automatically renew thereafter on the same terms and conditions, unless amended pursuant to paragraph 17 of this Agreement, for additional successive periods of one (1) year unless terminated by either party as set forth below.

(b)    If at the end of the Initial Term of this Agreement the Employee remains employed by the Company hereunder, and the Company and the Employee agree to the Employee or the Employee's professional corporation becoming a member of the Company, the Company shall offer the Employee the opportunity to purchase a number of Units of membership interests in the Company so that, after such purchase, the Employee or his professional corporation will own a percentage of the Units of membership interests in the Company determined by dividing 100% by the number of members of the Company at that time, including the Employee. The decision whether to allow Employee or Employee's professional corporation to become a member of the Company and, if applicable, the offer of such opportunity to Employee shall be made within thirty (30) days after the end of the Initial Term. In the event Employee accepts such offer, the admission of Employee or Employee's professional corporation as a member of the Company shall be completed within thirty (30) days of such acceptance. The purchase price of such Units shall be the per Unit book value of the Company determined as of the date of such purchase by the Company's regular accountant in accordance with generally accepted accounting principles applied consistently with the Company's financial statements from previous years; provided, however, that for purposes of calculating the purchase price, the Company's accounts receivable shall be excluded from assets.

(c)    If the Employee or his professional corporation becomes a Member of the Company, the Employee will be required to personally guaranty all debts and lease

1729383 v1

obligations of the Company that are personally guaranteed by any of the other Members of the Company on the same terms and subject to the same conditions as the other Members of the Company who are guarantors of such obligations. Likewise, if the Employee or his professional corporation becomes a Member of the Company, the Employee will have the same ownership rights, through ownership of the Units purchased by him in the business and assets of the Company as do all other Members of the Company.

2.    <u>Duties</u>. During the continuation of his employment, the Employee shall devote the whole of his time during business hours for the benefit of the Company, either working directly for the Company or indirectly for its benefit by devoting his time and attention to other activities from which the Company can derive a material benefit. Except for consulting services rendered by the Employee for orthopedic equipment and pharmaceutical companies, which services are hereby expressly approved in advance by the Company for the term of this Agreement, other employment or outside work is expressly prohibited, unless with prior express permission of the Company, which permission shall not be unreasonably withheld. Employee shall be entitled to all fees or other compensation for such outside employment or other work, whether paid directly to the Employee or to the Company on the Employee's behalf. The Employee shall use his best efforts to promote the interests and welfare of the Company in every way. The Employee shall exercise and carry out all such duties and powers and shall observe all such directions and restrictions as the Company, from time to time, may confer or impose upon him.

3.    <u>Standard of Practice</u>. The Employee hereby represents and warrants that he has never (i) had his license to practice medicine in any state or his Drug Enforcement Agency number suspended, relinquished, terminated, restricted or revoked; (ii) been reprimanded, sanctioned or disciplined by any licensing board or by any federal, state or local society or agency, governmental body or specialty board; (iii) had entered into against the Employee final judgment in, or settled without judgment, a malpractice or similar action for any aggregate award or amount to the plaintiff; or (iv) had his medical staff privileges at any hospital or medical facility suspended, terminated, restricted or revoked.

In providing services pursuant to this Agreement, the Employee shall maintain a standard of care at least equivalent to that customarily provided by physicians practicing in the community. Throughout the term of the Employee's employment hereunder, the Employee shall (i) be licensed to practice medicine in the State of Alabama, and shall not have had his license revoked at any time; (ii) be in compliance with all applicable continuing professional education requirements of any federal, state or local governmental agency or applicable specialty board, as the same may exist from time to time; (iii) maintain all certificates or registrations necessary to order or administer pharmaceuticals, including, but not limited to, controlled substances, which may be reasonably necessary in the provision of services hereunder; (iv) be a participating provider in good standing with all third-party payors with whom the Company has a contractual relationship to obtain reimbursement for services rendered; (v) report in writing to the Company any restriction, limitation or revocation with respect to any license related to the practice of medicine which the Employee holds on the day the Employee receives notice of such restriction, limitation or revocation; (vi) submit to

testing for use of alcohol or drugs while performing Employee's duties hereunder, which may be required at any time by Company; and (vii) perform the Employee's duties hereunder in accordance with standards of third-party payors with whom the Company has a contractual relationship to obtain reimbursement for services rendered, applicable law, applicable professional ethics and rules of professional conduct, and such reasonable policies, standards and regulations of the Company as are from time to time established.

4.   Compensation.  As compensation for the services provided on behalf of the Company, the Employee shall be entitled to the following compensation:

4.1   The Employee shall be entitled to receive compensation each month in an amount equal to the excess of the Employee's Allocable Share of Revenues for such month over the Employee's Allocable Share of Expenses for such month, such excess being hereinafter referred to as *"Net Production."* The Employee's Allocable Share of Revenues and Allocable Share of Expenses shall be determined by the Company in accordance with the following guidelines:

(a)   The Employee's Allocable Share of Revenues shall consist of the collections, during the applicable period of the Employee's employment with the Company, of the accounts receivable of the Company directly attributable to the Employee's personally performed services, services furnished incident to those personally performed services, and ancillary medical services provided to the Employee's patients, excluding revenues from any designated health services not personally performed by the Employee or not furnished incident to those services, reduced by any discounts, claims, refunds, chargebacks or other appropriate reductions which have or will diminish such revenues, together with such additional revenues of the Company reasonably allocated to the Employee by the Company during the Employee's employment with the Company, all as determined by the Company each calendar month in a manner reasonably applied on a consistent basis to the Company's physician employees.

(b)   The Employee's Allocable Share of Expenses shall consist of the sum of the following:

(i)   The Employee's share of the general, operating and administrative overhead expenses of the Company; and

(ii)   All expenses specifically attributable to or paid on behalf of the Employee (including the compensation of the Employee received from the Company, benefits, malpractice, health, disability and other insurance, and expense reimbursement), all as reasonably determined by the Company.

4.2   The *"Net Production"* of the Employee for each month shall be computed following the close of the month based on the Employee's Allocable Share of Revenues less the Employee's Allocable Share of Expenses for the current month and shall be paid to the Employee by the thirtieth (30th) day of the month following the end of the month for which Net Production is being calculated.  If

the Net Production of the Employee computed for a particular month as set forth above is a negative number, then the amount of the negative Net Production shall be paid by the Employee to the Company. The Employee acknowledges that he will be indebted to and obligated to repay the Company for the full amount of the negative Net Production, if any, of the Employee on a monthly basis. The Company represents and warrants to the Employee that the Company is and shall remain a group practice under the federal physician self-referral (or Stark) law.

4.3   Schedule 4.3 hereto contains the agreement between the Company and the Employee regarding certain advances, if any, to be made to the Employee during the first eighteen (18) months of the Employee's employment hereunder, and said Schedule 4.3 is hereby incorporated into and made a part of this Agreement.

4.4   The Employee hereby assigns to the Company the right to receive payment for all professional services rendered by the Employee hereunder during the term to patients of the Company. The Company shall bill and collect from patients of the Company, or from the persons, firms or entities responsible for such payments, the charges for the professional medical services rendered by the Employee hereunder to or for such patients. The Company and the Employee acknowledge and agree that the Employee shall be granted unrestricted access to claims submitted by the Company for services rendered by the Employee pursuant to this Agreement, upon the prior written request of the Employee and during normal business hours of the Company.

5.   Health and Disability Insurance.

5.1   The Company shall secure for the Employee and his family, for and during his term of employment with the Company, health insurance with an insurance company (or companies) licensed to provide health insurance in the State of Alabama and satisfactory to the Company.

5.2   The Company shall secure for the Employee, for and during his term of employment with the Company disability insurance with an insurance company (or companies) licensed to provide disability insurance in the State of Alabama in an amount determined by the Company.

5.3   The Employee shall be entitled to reasonable time off for vacation, sick leave, holidays and continuing medical education.

6.   Facilities and Services. The Employee shall be furnished with such facilities and services (for example, examination facilities, professional personnel, general office services, equipment and supplies) as may be suitable to the Employee's position or adequate for the performance of the Employee's duties hereunder.

7.   Books and Periodicals.   The Company agrees to subscribe to and purchase such periodicals, books and other publications as shall be useful and helpful to the Employee

in the practice of medicine, as determined and approved by the Company. All such periodicals, books and publications shall be and remain the property of the Company.

8. <u>Reproduction of Records; Transfer of Records</u>. Patients and patient files, x-rays, reports and other patient related documents (collectively, the "*Medical Records*"), shall belong to and remain the property of the Company. If this Agreement is terminated, at any time, the Company shall give the Employee a copy of each patient's Medical Record, in accordance with applicable law, upon presentation of a written request and a duly executed authorization from the patient or if needed for purposes of any investigation or litigation in which the Employee is involved, subject only to a reasonable charge to the Employee for the cost of making copies of such Medical Records. If this Agreement is terminated, at any time, the Company and the Employee jointly, shall at its expense promptly notify each patient treated regularly and primarily by the Employee during the term of this Agreement of the Employee's departure from the Company, the Employee's new practice location, the patient's opportunity to have transferred his or her Medical Records to the Employee with instructions on how to request such a transfer, and any other information considered necessary or appropriate by the parties. The content of the notice shall be subject to the final approval of the Company and the Employee. In the event the Company receives an informal request by a patient regarding the Employee's new location following termination of this Agreement, the Company agrees to promptly provide such information to the patient.

9. <u>Expenses</u>. The Employee shall incur and pay, in the course of his employment by the Company, certain necessary expenses as a practicing physician including, but not limited to, automobile and transportation expenses; professional, entertainment and promotional expenses; continuing medical education expenses; home long-distance telephone bills; dues and expenses of membership in medical societies; and all other items of reasonable and necessary professional expenses incurred by the Employee in the interests of the medical practice of the Company. Nothing in this paragraph 9, however, will prevent the Company from assuming or reimbursing the Employee for any expenses in any of the categories above enumerated.

10. <u>Rules and Regulations</u>. The Employee agrees to observe and comply with the rules and regulations of the Company, either adopted orally or in writing, respecting the performance of his duties, and to carry out and to perform orders, directions and policies announced to him by the Company, from time to time, either orally or in writing. The Employee specifically understands that the Company shall have final authority over the acceptance or refusal of any person for whom professional services may be rendered and over the amount of fees to be charged to such persons.

11. <u>Professional Liability Insurance</u>. The Company shall secure and carry for the Employee, for and during his term of employment with the Company, professional liability insurance in an amount to be determined by the Company, but in no event less than One Million Dollars ($1,000,000.00) per incident, and Three Million Dollars ($3,000,000.00) annual aggregate without the express written consent of the Employee, with a casualty insurance company (or companies) licensed to provide insurance in the State of Alabama and satisfactory to Company, insuring the Employee against claims for malpractice or

negligence in the practice of medicine during the term of his employment with the Company. Upon termination of employment, Employee shall be required to purchase and shall be solely responsible to pay the cost of a tail coverage professional liability insurance policy in an amount equal to the coverage maintained during the term of this Agreement or such lesser amount as may be determined by the Company, sufficient to provide continuing insurance protection for the Company and the Employee against claims for malpractice or negligence occasioned by the acts of the Employee while he was an employee of the Company. The Employee shall be required to provide and maintain such insurance protection for a period no longer than the applicable statute of limitations for such malpractice or negligence claims. The parties agree that tail coverage may be provided by the Employee through a reporting endorsement or through "*prior acts*" coverage with a new carrier. In the event the Employee fails to purchase such tail coverage professional liability insurance policy, then the Company may purchase such insurance and offset the cost against any amounts due Employee, with the Employee reimbursing the Company for any deficiency. The responsibilities contained herein with respect to maintaining tail coverage professional liability insurance by the Employee shall survive the termination of this Agreement.

12.    Termination.    Employee's employment shall be automatically terminated upon the happening of any of the following events:

12.1    Notwithstanding any of the provisions of this Agreement, upon at least sixty (60) days' prior written notice served by either the Company or the Employee upon the other;

12.2    Upon the death of the Employee;

12.3    Upon the dissolution of the Company;

12.4    Upon the Employee becoming permanently disabled (for purposes of this Agreement, the term "*disabled*" shall mean the inability of the Employee, arising out of any medically determinable physical or mental impairment, to perform the services required of him hereunder for a period of sixty (60) consecutive days (or sixty (60) non-consecutive days in any twelve (12) month period) during which sixty (60) day period the Employee's compensation hereunder shall continue); such total and permanent disability, as well as the effective date thereof, shall be agreed upon at the end of the sixty (60) day period of continuous disability by the Company and the Employee (or the Employee's legal representative) or, if an agreement cannot be reached, shall be determined by a physician licensed to practice medicine in the State of Alabama selected by the Company and reasonably acceptable to the Employee or his legal representative, and certified by such physician as being, in his or her opinion, of a permanent nature. The determination of such physician shall be conclusive and binding on all parties hereto.;

12.5    At the Company's option, immediately upon the existence of Cause. For purposes of this Section 12.5 the term "*Cause*" shall be defined as:

(i)     failure of the Employee to perform the duties required of him in this Agreement in a manner satisfactory to the Company, in its reasonable discretion; provided, however, that employment shall not be terminated pursuant to this subsection (i) unless the Company first gives the Employee a written notice ("*Notice of Deficiency*"). The Notice of Deficiency shall specify the deficiencies in the Employee's performance of his duties. The Employee shall have a period of twenty (20) days, commencing on receipt of the Notice of Deficiency, in which to cure the deficiencies contained in the Notice of Deficiency. In the event the Employee does not cure the deficiencies to the satisfaction of the Company, in its sole discretion, within such twenty (20) day period, the Company shall have the right to immediately terminate this Agreement and the Employee's employment. The provisions of this paragraph (i) may be invoked by the Company any number of times and cure of deficiencies contained in any Notice of Deficiency shall not be construed as a waiver of this paragraph (i) nor prevent the Company from issuing any subsequent Notices of Deficiency;

(ii)    any dishonesty by the Employee in his dealings with the Company, the commission of fraud by the Employee, or negligence or willful neglect in the performance of the duties of the Employee;

(iii)   the conviction (or plea of guilty or nolo contendere) of the Employee of any felony or other crime involving dishonesty or moral turpitude;

(iv)    unlawful use of narcotics or other controlled substances, or use of alcohol or other drugs in a manner the Company reasonably determines to be adverse to the best interests of the Company and/or its patients;

(v)     failure of the Employee to maintain his license and authorization to practice as a physician and surgeon in the State of Alabama;

(vi)    Upon the expulsion of the Employee from membership in any professional society or association for violation of ethical standards;

(vii)   if applicable law requires that the Employee's employment with the Company be terminated;

(viii)  if, due to any act or omission of the Employee, the medical professional liability insurance required by this Agreement cannot be reasonably obtained or maintained, or, if due to any act or omission of the Employee, such medical professional liability insurance is cancelled, terminated or revoked.

For all purposes of this Agreement, termination for Cause shall be deemed to have occurred in the event of the Employee's resignation when, because of existing facts and circumstances, subsequent termination for cause can be reasonably foreseen.

12.6    At the Employee's option, immediately upon the existence of Cause. For purposes of this Section 12.6, the term "*Cause*" shall be defined as the failure of

the Company to perform the duties required of it in this Agreement; provided, however, that employment shall not be terminated pursuant to this Section 12.6 unless the Employee first gives the Company a written notice ("*Notice of Deficiency*"). The Notice of Deficiency shall specify the deficiencies in the Company's performance of its duties. The Company shall have a period of twenty (20) days, commencing on receipt of the Notice of Deficiency, in which to cure the deficiencies contained in the Notice of Deficiency. In the event the Company does not institute a reasonable process to cure the deficiencies within such twenty (20) day period, the Employee shall have the right to immediately terminate this Agreement and the Employee's employment. The provisions of this Section 12.6 may be invoked by the Employee any number of times and cure of deficiencies contained in any Notice of Deficiency shall not be construed as a waiver of this Section 12.6 nor prevent the Employee from issuing any subsequent Notices of Deficiency.

In the event of termination of this Agreement pursuant to this paragraph 12, the Employee or his estate, as appropriate, shall be entitled to receive (in addition to any fringe benefits payable upon death in the case of the Employee's death), the compensation provided for in paragraph 4 hereof up to and including the effective date of termination. In addition to the compensation provided for in paragraph 4, the Employee shall also be entitled to receive any accounts receivable attributable to medical services provided by the Employee on or before the termination date. All accounts receivable collected after termination of Employee's employment that are attributable to medical services provided by Employee on or before the termination date shall be paid to Employee net of a ten percent (10%) collection fee to be retained by the Company to compensate the Company for the service of collecting such receivables.

If the Employee is arrested for or charged with the commission of any felony or other crime involving moral turpitude, the Company may in its sole discretion require the Employee to take a leave of absence until the completion of the trial for or dismissal of such charge.

13.   Repayments Upon Termination. In the event of any termination of employment pursuant to this Agreement for any reason, the Employee or the estate of the Employee, as the case may be, shall pay to the Company within thirty (30) days of the date of termination an amount equal to the value of all property, rights or assets of the Company which shall be transferred to the Employee or to the estate of the Employee, as the case may be. The value of such items shall be conclusively determined by the accountants for the Company. Such items shall include, but shall not be limited to, life insurance policies, automobile insurance policies, and all pre-payments of premiums for the aforementioned policies, prorated to the closing date. In the event that such payments are not made to the Company within said thirty (30) day period, the Company shall have the right to offset the amount of such payments against any amounts due to such Employee or the estate of such Employee from the Company.

14.   Applicable Law. This Agreement shall be subject to and construed under the laws of the State of Alabama.

15. <u>Invalidity</u>. If any term or provision of this Agreement shall be invalid or unenforceable to any extent or application, then the remainder of this Agreement shall be valid and enforceable to the fullest extent and the broadest application permitted by law.

16. <u>Interpretation of Agreement</u>. All parties have participated fully in the negotiation and drafting of this Agreement. This Agreement has been prepared by all parties equally, and is to be interpreted according to its terms. No inference shall be drawn that this Agreement was prepared by or is the product of any particular party or parties.

17. <u>Amendments</u>. This Agreement shall not be modified or amended except by a writing signed by both the Employee and the Company.

18. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and replaces, supersedes and cancels any and all employment agreements, deferred compensation agreements, or employment arrangements, whether written or oral, between the parties hereto, made at any time prior to the date hereof.

19. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of any successor to the Company and such successor shall be deemed substituted for the Company under the terms of this Agreement. As used in this Agreement, the term *"successor"* shall include any person, firm, corporation or other business entity which at any time, whether by merger, purchase or otherwise, acquires all or substantially all the assets of the business of the Company. This Agreement shall also be binding upon and inure to the benefit of the Employee, his heirs, executors and administrators.

20. <u>Captions</u>. The captions or headings in this Agreement are made for convenience and general reference only and shall not be construed to describe, define or limit the scope or intent of the provisions of this Agreement.

21. <u>Confidentiality</u>. The information contained in this Agreement, and all information related to this Agreement, which is not otherwise known to the public shall be held by each party as confidential and proprietary information of the other party and shall not be disclosed without the prior written consent of the other party; provided, however, that such information may be disclosed to a party's attorney, accountant or financial advisor, or pursuant to valid legal process (in which case such party shall provide a copy of such legal process to the other party in sufficient time prior to such disclosure for the party to defend its rights hereunder). The provisions of this Section shall survive the expiration or any termination of this Agreement.

22. <u>Notices</u>. Any notice permitted or required under this Agreement shall be deemed given when delivered personally or deposited in the United States mail, certified, postage prepaid, addressed as follows:

**If to the Company:**

Andrews Sports Medicine and Orthopaedic Center, LLC.
805 St. Vincent's Drive, Suite 100
Birmingham, Alabama 35205
Attn: Administrator

1729383 v1

9

**If to the Employee:**

John Ward Cory, M.D.
16432 N 49th Street
Scottsdale, AZ 85254

Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section.

23. <u>Practice of Medicine</u>.   The parties acknowledge that the Company neither has nor exercises any control over the professional medical judgment, medical treatment, method of clinical practice or physician services rendered by the Employee hereunder, and that the Company is relying on the Employee to exercise the Employee's best professional medical judgment in rendering physician services hereunder.

24. <u>Intellectual Property</u>. Inventions solely invented by the Employee and any and all right, title and interest therein (including but not limited to patent, trade secret and copyrights) shall be, and shall be deemed, the sole and exclusive property of the Employee. The Company agrees that during the term of this Agreement and thereafter, any such Inventions and all information related thereto, which is not otherwise known to the public, shall not be used or disclosed by the Company without the prior written consent of the Employee. "Inventions" shall mean, in whole and in part, inventions, innovations, improvements, ideas, discoveries, concepts, works of authorship and other creative works (including but not limited to processes, know-how, models, drawings, designs, plans, methods, trade identifiers, documents, reports, notes, computer programs and computer code (without regard to programming language, format, or state of completion)), whether or not patentable, and if patentable, whether or not patented, that is made, discovered, conceived or created at any time solely by the Employee.

**IN WITNESS WHEREOF**, the Company, by and through its duly authorized officers, and the Employee have caused this Agreement to be executed under seal on the day and year first above written.

**COMPANY:**
Andrews Sports Medicine
and Orthopaedic Center, LLC

By: _____
Name: _____
Its:     PRESIDENT

**EMPLOYEE:**

_____
John Ward Cory, M.D.

## SCHEDULE 4.3

During the term of the Employment Agreement to which this Schedule is attached (the "Agreement"), and pursuant to the terms and conditions contained in the Agreement, the Company will make arrangements to provide advances to the Employee against future earnings as described below. In order to provide such advances, the Company and the Employee will establish a line of credit from a financial institution agreeable to both parties in an amount agreed to by the parties. The Employee will be the primary borrower on the line of credit and will be ultimately responsible for repaying any advances made under such line. The Company will guaranty the line of credit, but to the extent the Company is required to repay any amounts drawn under such line, the Employee will be liable to the Company to reimburse the Company for all such amounts. The Company will be the only party allowed to draw on such line of credit, and all draws on such line will be used only for the purposes specified in this Schedule 4.3. From time to time, as needed for the purposes specified below, the Company will draw on such line of credit. The Company will notify the Employee promptly after each draw under such line and shall provide the Employee copies of all periodic statements received from the financial institution regarding such line.

The Company will make draws on the line for the following purposes and will utilize the money received from such draws in the following manner:

1.  The Company will make an initial draw against the line of credit in the amount of $60,000 and disburse such amount to the Employee for the purpose of paying certain moving expenses, malpractice insurance tail premiums and other expenses incurred by the Employee in moving from his previous practice to practice with the Employee.

2.  At the end of each month the Company will draw an amount on the line of credit equal to the excess, if any, of (a) the sum of the Employee's Allocable Share of Expenses for such month plus $25,000.00, over (b) the Employee's Allocable Share of Revenues for such month. All or a portion of such draw will be paid to the Employee to the extent necessary so that the portion of such draw paid to the Employee plus the Employee's Net Production for such month will equal $25,000.00. For so long as there remains any amount owing under the line of credit, any Net Production of the Employee in any month that exceeds $25,000 shall be used to pay down the line of credit.

In consideration for the Company's agreement to assist the Employee in establishing the line of credit as provided in this Schedule 4.3, in each of the 12 months immediately following the month in which all amounts under the line of credit have been repaid, the Employee's compensation will be reduced by an amount equal to 15% of the amount by which (a) the Employee's Allocable Share of Revenues for such month exceeds (b) the sum of the Employee's Allocable Share of expenses for such month plus $25,000.00. The 15% retained by the Company will be allocated equally among the Members of the Company; provided that if the Employee or a Professional Corporation owned by the Employee is at that time a Member of the Company the Employee or his PC wil not share in any such amount.

Notwithstanding anything to the contrary contained herein, the line of credit will be terminated and fully repaid by the Employee no later than 24 months from the date of the Agreement. In addition, to the extent the line has been fully drawn, and there is no remaining availability under the line of credit, the Company shall have no liability to the Employee to guaranty any salary or other payment to the Employee other than the compensation to which the Employee is entitled under Section 4.1 of the Agreement.

## FIRST AMENDMENT TO EMPLOYMENT AGREEMENT

This First Amendment to Employment Agreement (this *"Amendment"*) is entered into this the 1st day of November, 2009, by and between **Andrews Sports Medicine and Orthopaedic Center, LLC**, an Alabama limited liability company (the *"Company"*), and **John Ward Cory, M.D.** (the *"Employee"*).

### RECITALS

The Company and the Employee executed an Employment Agreement dated September 8, 2009 (the *"Agreement"*). The Company and the Employee now desire to amend the Agreement as provided for herein.

### AGREEMENT

**NOW, THEREFORE,** for and in consideration of the premises and the mutual promises and covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     <u>Amendment to Paragraph 4.1</u>: Paragraph 4.1 of the Agreement is hereby amended by deleting the last sentence of Paragraph 4.1 and replacing it with the following provision:

> The Employee's Allocable Share of Revenues, Allocable Share of Expenses and Net Production shall be determined by the Company in accordance with the following guidelines:

2.     <u>Amendment to Paragraph 4.1(a)</u>: Paragraph 4.1(a) of the Agreement is hereby deleted in its entirety and replaced with the following provision:

> (a)    The Employee's Allocable Share of Revenues shall consist of the collections, during the applicable period of the Employee's employment with the Company, of the accounts receivable of the Company directly attributable to the physician services of Employee, excluding revenues from any Stark Law designated health services (collectively, "Ancillary Services"), reduced by any discounts, claims, refunds, chargebacks or other appropriate reductions which have or will diminish such revenues, together with such additional revenues of the Company reasonably allocated to the Employee by the Company during the Employee's employment with the Company, all as determined by the Company each calendar year in a manner reasonably applied on a consistent basis to the Company's physician employees.

3.     <u>Amendment to Paragraph 4.1(b)(i)</u>. Paragraph 4.1(b)(i) of the Agreement is hereby deleted in its entirety and replaced with the following provision:

> The Employee's share of the general, operating and administrative overhead expenses of the Company, excluding these expenses associated with the provision of Ancillary Services; provided, however, that if (x) the Employee is disabled (as such term is defined in paragraph 12.4 below) at any time during the term of this Agreement, and (y) at the time of such disability the Company employs at least eight (8) surgeons who are allocated their full share of such general, operating and

administrative overhead expenses, then during the first ninety (90) days of the period of such disability, such expenses will not be allocated to the Employee; and

4.    Re-designation of Paragraph 4.2: Paragraph 4.2 of the Agreement shall be re-designated as Paragraph 4.1(c) of the Agreement.

5.    New Paragraph 4.2: The following Paragraph 4.2 is hereby added to the Agreement:

In addition to the compensation received by Employee pursuant to paragraph 4.1 of this Agreement, Employee shall also be eligible to receive compensation based on the provision of Ancillary Services to the Company in an amount calculated pursuant to the Company's Ancillary Compensation Plan, dated November 1, 2009 ("ACP"), as may be amended from time to time.

6.    Amendment to Paragraph 12.4: Paragraph 12.4 of the Agreement is hereby deleted in its entirety and replaced with the following provision:

Upon the Employee becoming permanently disabled (for purposes of this Agreement, the term "*disabled*" shall mean the inability of the Employee, arising out of any medically determinable physical or mental impairment, to perform the services required of him hereunder for a period of ninety (90) consecutive days (or ninety (90) non-consecutive days in any twelve (12) month period) during which ninety (90) day period the Employee's compensation hereunder shall continue); such total and permanent disability, as well as the effective date thereof, shall be agreed upon at the end of the ninety (90) day period of continuous disability by the Company and the Employee (or the Employee's legal representative) or, if an agreement cannot be reached, shall be determined by a physician licensed to practice medicine in the State of Alabama selected by the Company and reasonably acceptable to the Employee or his legal representative, and certified by such physician as being, in his or her opinion, of a permanent nature. The determination of such physician shall be conclusive and binding on all parties hereto.

7.    Amendment to Paragraph 12: The provision of Paragraph 12 of the Agreement beginning with "In the event of termination of this Agreement pursuant to this paragraph 12" shall be deleted in its entirety and replaced with the following provision:

In the event of termination of this Agreement pursuant to this paragraph 12, the Employee or his estate, as appropriate, shall be entitled to receive (in addition to any fringe benefits payable upon death in the case of the Employee's death) the compensation provided for in paragraph 4.1 hereof up to and including the effective date of termination. In addition to the compensation provided for in paragraph 4.1, the Employee shall also be entitled to receive any accounts receivable attributable to physician services provided by the Employee on or before the termination date. The accounts receivable payable pursuant to this provision shall not include any accounts receivable derived from the provision of Ancillary Services, which shall be payable in accordance with the ACP. All

1770710 v3                                   2

accounts receivable collected after termination of Employee's employment attributable to physician services performed by Employee on or before the termination date, other than those excluded above, shall be paid to Employee net of a ten percent (10%) collection fee to be retained by the Company to compensate the Company for the service of collecting such receivables.

8.     Except as herein specifically amended, all the terms of the Agreement shall remain in full force and effect and are hereby ratified, confirmed and approved by the Company and the Employee.

9.     This Amendment may be executed in several counterparts, each of which, when so executed, shall be deemed to be an original, and such counterparts shall together constitute and be one and the same instrument.

**[Signatures on Following Page]**

**IN WITNESS WHEREOF**, this Amendment has been executed by the parties hereto as of the day and year first above written.

COMPANY:

**Andrews Sports Medicine and Orthopaedic Center, LLC**

By: _____

Name: _____

Its: _____

EMPLOYEE:

_____

**John Ward Cory, M.D.**

**EXHIBIT B**

**BUSINESS LOAN AGREEMENT**



OAKWORTH
CAPITAL BANK

| LOAN NUMBER | AGREEMENT DATE | AGREEMENT/ACCOUNT NUMBER |
|---|---|---|
| 900031900 | October 8, 2009 | 900031900 |

**BORROWER INFORMATION**

John W Cory
3425 Springhill Road
Birmingham, AL 35223

**Type of Entity:** Individual
**State of Residence:** Alabama

**GUARANTOR INFORMATION**

Andrews Sports Medicine and Orthopaedic Center, LLC
805 St. Vincent's Drive, Suite 100
Birmingham, AL 35205

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Alabama

E Lyle Cain Jr.
401 Meadow Brook Lane
Birmingham, AL 35213

**Type of Entity:** Individual
**State of Residence:** Alabama

Jeffrey R Dugas
7500 Kings Mountain Ridge Way
Vestavia, AL 35242

**Type of Entity:** Individual
**State of Residence:** Alabama

**AGREEMENT.** This Business Loan Agreement will be referred to in this document as the "Agreement." This Agreement is made by Oakworth Capital Bank (Lender), Borrower and Guarantor. The consideration is the promises, representations, and warranties made in this Agreement and the Related Documents.

**DEFINITIONS.** These definitions are used in this Agreement.

"**Collateral**" means the Property that all Obligors pledge, mortgage, or give Lender a security interest in, regardless of where the Property is located and regardless of when it was or will be acquired, together with all replacements, substitutions, proceeds, and products of the Property.

"**Events of Default**" means any of the events described in the "Events of Default" section of this Agreement.

"**Financial Statements**" means the balance sheets, earnings statements, and other financial information that Obligors have, are, or will be giving to Lender.

"**Indebtedness**" means the Loan and all other loans and indebtedness of Borrower to Lender, including but not limited to Lender's payments of insurance or taxes, all amounts Lender pays to protect its interest in the Collateral, overdrafts in deposit accounts with Lender, and all other indebtedness, obligations, and liabilities of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising.

"**Loan**" means the loan or loans Lender makes to Borrower under the note or notes dated the same date as this Agreement that Borrower gives to Lender and all amendments, extensions, renewals, and refinancing.

"**Obligor**" means any person having any obligation to Lender, whether for the payment of money or otherwise, under this Agreement or under the Related Documents, including but not limited to Guarantor and any other guarantors of the Indebtedness.

"**Parties**" means all Borrowers, Guarantors, and Non-Borrower Debtors signing this Agreement.

"**Party**" means any Borrower, Guarantor, and Non-Borrower Debtor signing this Agreement.

"**Property**" means the Parties' assets, regardless of what kind of assets they are.

"**Related Documents**" means all documents, promissory notes, security agreements, leases, mortgages, construction loan agreements, assignments of leases and rents, guaranties, pledges, and all other documents or agreements executed in connection with this Agreement. The term includes both documents existing at the time of execution of this Agreement and documents executed after the date of this Agreement.

**IDENTIFICATION OF INDEBTEDNESS.** The following loan and any amendments, extensions, renewals or refinancing (the "Loans") thereof is subject to this Agreement:

- Loan number 900031900 with a principal amount of $500,000.00

© 2004-2008 Compliance Systems, Inc. f965214f-77a7b9c6 - 2008.11.148
Business Loan Agreement - DL4004

www.compliancesystems.com
800-968-8522 - Fax 616-956-1868

  

**BORROWER'S REPRESENTATIONS AND WARRANTIES.** Obligors represent and warrant to Lender the accuracy of the description of Borrower and Guarantor, the nature of Borrower's business shown above, and the statements made in this section. The representations and warranties will continue and remain in effect until all of the Indebtedness is fully paid to Lender and Obligors' obligations are fully performed.

**Borrower's Existence and Authority.** Borrower is duly formed and in good standing under all laws governing Borrower and Borrower's business, and the person or persons executing this Agreement have the power and authority to execute this Agreement and the Related Documents and to bind Borrower to the obligation created in this Agreement and the Related Documents.

**Financial Information and Filing.** All Financial Statements provided to Lender have been prepared and will continue to be prepared in accordance with generally accepted accounting principles, consistently applied, and fully and fairly present the financial condition of Obligors, and there has been no material adverse change in Obligors' business, Property, or condition, either financial or otherwise, since the date of Obligors' latest Financial Statements. Obligors have filed all federal, state, and local tax returns and other reports and filings required by law to be filed before the date of this Agreement and have paid all taxes, assessments, and other charges that are due and payable prior to the date of this Agreement. Obligors have made reasonable provision for these types of payments that are accrued but not yet payable. Borrower does not know of any deficiency or additional assessment not disclosed in Borrower's books and records.

**Title and Encumbrances.** Obligors have good title to all of Obligors' assets. All encumbrances on any part of the Property were disclosed to Lender in writing.

**Compliance with General Law.** Borrower is in compliance with and will conduct its business and use its assets in compliance with all laws, regulations, ordinances, directives, and orders of any level of governmental authority that has jurisdiction over Borrower, Borrower's business, or Borrower's assets.

**Environmental Compliance.** Obligors are in compliance with all applicable laws and rules of federal, state, and local authorities affecting the environment, as all have been or are amended.

**No Litigation/No Misrepresentations.** There are no existing or pending suits or proceedings before any court, government agency, arbitration panel, administrative tribunal, or other body, or threatened against Borrower that may result in any material adverse change in Borrower's business, property, or financial condition, and all representations and warranties in this Agreement and the Loan Documents are true and correct and no material fact has been omitted.

**EVENTS OF DEFAULT.** The occurrence of any of the following events will be an Event of Default.

**Noncompliance with Lender Agreements.** Default by Borrower or Guarantor under any provision of this Agreement, the Related Documents, or any other agreement with Lender.

**False Statements.** If an Obligor made or makes a false or misleading misrepresentation in the Related Documents, in any supporting material submitted to Lender or to third parties providing reports to Lender, or in Financial Statements given to or to be given to Lender.

**Material Adverse Change.** Any material adverse change in the Borrower's business, financial condition, or the Property has occurred or is imminent; if the full performance of the obligations of any Obligor is materially impaired; or if the Collateral and its value or Lender's rights with respect thereto are materially impaired in any way. The existence or reasonable likelihood of litigation, governmental proceeding, default, or other event that may materially and adversely affect an Obligor's business, financial condition, or the Property.

**Insolvency or Liquidation.** An Obligor voluntarily suspends transaction of its business or does not generally pay debts as they mature. If an Obligor has or will make a general assignment for the benefit of creditors or will file, or have filed against it, any petition under federal bankruptcy law or under any other state or federal law providing for the relief of debtors if the resulting proceeding is not discharged within thirty days after filing. If a receiver, trustee, or custodian is or will be appointed for an Obligor.

**Default on Unrelated Debt.** If Borrower or Guarantor materially defaults under a provision of an agreement with a third party or if the indebtedness under such an agreement is accelerated.

**Judgments or Attachments.** If there is entered against an Obligor a judgment that materially affects the Borrower's business, financial condition, or the Property, or if a tax lien, levy, writ of attachment, garnishment, execution, or similar item is or will be issued against the Collateral or which materially affects Borrower's business, financial condition, or the Property, and which remains unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for thirty days after it was issued.

**Collateral Impairment.** Lender has a good-faith belief that Lender's rights in the Collateral are or will soon be impaired or that the Collateral itself is or soon will be impaired.

**Termination of Existence or Change in Control.** If Borrower or Borrower's business is sold or merged or if Borrower or Borrower's business suspends business or ceases to exist.

**Insecurity.** If Lender has a good-faith belief that any Party is unable or will soon be unable to perform that Party's duties under this Agreement or under the Related Documents.

**Death.** The death of an individual who is an Obligor, a partner in a partnership that is an Obligor, a member in a limited liability company that is an Obligor, an officer of a corporation that is an Obligor, or an individual of similar position in any other type of business organization that is an Obligor.




**REMEDIES ON DEFAULT.**

**Remedies, No Waiver.** The remedies provided for in this Agreement, the Related Documents, and by law are cumulative and not exclusive. Lender reserves the right to exercise some, all, or none of its rights and reserves the right to exercise any right at any time that Lender has the right, without regard to how much time has passed since the right arose. Lender may exercise its rights in its sole, absolute discretion.

**Acceleration, Setoff.** Upon an Event of Default, the Loan and the Indebtedness may, at Lender's sole option, be declared immediately due and payable. Lender may apply Obligors' bank accounts and any other property held by Lender against the Indebtedness.

**CROSS-DEFAULT.** The default of any Party under this Agreement, the Related Documents, or under any other obligation to Lender is a default under this Agreement.

**ATTORNEYS' FEES AND OTHER COSTS.** If legal proceedings are instituted to enforce the terms of this Agreement, Borrower agrees to pay all costs of the Lender in connection therewith, including reasonable attorneys' fees, to the extent permitted by law.

**EXPENSES.** Obligors agree to pay all of Lender's reasonable expenses incidental to perfecting Lender's security interests and liens, all insurance premiums, Uniform Commercial Code search fees, and all reasonable fees incurred by Lender for audits, inspection, and copying of the Obligors' books and records. Obligors also agree to pay all reasonable costs and expenses of Lender in connection with the enforcement of Lender's rights and remedies under this Agreement, the Related Documents, and any other agreement between one or more Obligors and Lender, and in connection with the preparation of all amendments, modifications, and waivers of consent with respect to this Agreement, including reasonable attorneys' fees.

**GOVERNING LAW/PARTIAL ILLEGALITY.** This Agreement and the Related Documents are and will be governed by, and the rights of the Parties will be determined by the laws of the state of Alabama except to the extent that federal law controls. If any part, term, or provision of this Agreement is determined to be illegal or in conflict with state or federal law, the validity of the remaining portion or provisions of this Agreement will not be affected, unless the stricken portion or provision adversely affects Lender's risk of realizing Lender's anticipated return, in which case Lender may, in its sole discretion, deem the Loan matured.

**NOTICES.** All notices required under this Agreement must be in writing and will be considered given: (i) on the day of personal delivery, or (ii) one business day after deposit with a nationally recognized overnight courier service, or (iii) three business days after deposit with the United States Postal Service sent certified mail, return receipt requested. Any of these methods may be used to give notice. All notices must be sent to the party or parties entitled to notice at the addresses first set forth in this Agreement. Any Party may change its address for notice purposes on five days prior written notice to the other Parties.

**INTEGRATION AND AMENDMENT.** This Agreement and other written agreements among the Parties, including but not limited to the Related Documents, are the entire agreement of the Parties and will be interpreted as a group, one with the others. None of the Parties will be bound by anything not expressed in writing, and this Agreement cannot be modified except by a writing executed by those Parties burdened by the modification.

**FURTHER ACTION.** Obligors will, upon request of Lender, make, execute, acknowledge, and deliver to Lender the modified and additional instruments, documents, and agreements, and will take the further action that is reasonably required, to carry out the intent and purpose of this transaction.

**CONTINUING EFFECT.** Unless superseded by a later Business Loan Agreement, this Agreement will continue in full force and effect until all of the Obligors' obligations to Lender are fully satisfied and the Loan and Indebtedness are fully repaid.

**HEADINGS.** All headings in this Agreement are included for reference only and do not have any effect on the interpretation of this Agreement.

**COUNTERPARTS.** This Agreement may be executed by the Parties using any number of copies of the Agreement. All executed copies taken together will be treated as a single Agreement.

**TIME IS OF THE ESSENCE.** Time is of the essence in the performance of this Agreement.

**TRANSFERS.** Borrower may not assign or transfer its rights or obligations under this Agreement without Lender's prior written consent. Lender may transfer its interest in Lender's sole discretion. Borrower waives all rights of offset and counterclaim Borrower has against Lender. The purchaser of a participation in the loan may enforce its interest regardless of any claims or defenses Borrower has against Lender.

**JURISDICTION.** Obligors agree to waive any objection to jurisdiction or venue on the ground that Obligors are not residents of Lender's locality. Obligors authorize any action brought to enforce Obligors' obligations to be instituted and prosecuted in any state court having jurisdiction or in the United States District Court for the District that includes Lender's location as set forth at the beginning of this Agreement. Obligors authorize Lender to elect the court at Lender's sole discretion.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**By signing this Agreement, Borrower acknowledges reading, understanding and agreeing to all its provisions and receipt of a copy hereof.**

_signature_   10-8-09

John W. Cory    Date
Individually

© 2004-2008 Compliance Systems, Inc. f965214f-77a7b8c6 - 2008.11.148
Business Loan Agreement - DL4004

www.compliancesystems.com
800-968-8522 - Fax 616-956-1868

## AGREEMENT OF GUARANTOR

Guarantor (i) acknowledges reading and understanding this Agreement; (ii) consents to the provisions of this Agreement relating to Borrower; (iii) agrees to furnish the Financial Statements to Lender that Lender reasonably requests; (iv) agrees to those portions of this Agreement that apply to Guarantor; (v) acknowledges that this Agreement has been freely executed without duress and after an opportunity to consult with counsel; and (vi) confirms that Guarantor received a copy of this Agreement, the Guaranty, and the other documents Guarantor requested.

_____   10-8-09           _____   10-8-09
E Lyle Cain Jr.                     Date              Jeffrey R Dugas                     Date
Individually                                          Individually

Andrews Sports Medicine and Orthopaedic Center, LLC

_____   10-8-09           _____   10-8-09
By: E Lyle Cain Jr.                 Date              By: Jeffrey R Dugas                 Date
Its: Member                                           Its: Member




**EXHIBIT C**

**COMMERCIAL LINE OF CREDIT**
**AGREEMENT AND NOTE**



OAKWORTH
CAPITAL BANK

| LOAN NUMBER | AGREEMENT DATE | LINE OF CREDIT LIMIT | DRAW EXPIRATION DATE | MATURITY DATE |
|---|---|---|---|---|
| 900031900 | October 8, 2009 | $500,000.00 | October 8, 2010 | October 8, 2010 |

**LOAN PURPOSE:** Working capital.

**BORROWER INFORMATION**



John W Cory
3425 Springhill Road
Birmingham, AL 35223

**LINE OF CREDIT AGREEMENT AND NOTE.** This Commercial Line of Credit Agreement and Note will be referred to in this document as the "Agreement".

**LENDER.** "Lender" means Oakworth Capital Bank whose address is 2100A Southbridge Parkway, Suite 445, Birmingham, Alabama 35209 , its successors and assigns.

**BORROWER.** "Borrower" means each person or legal entity who signs this Agreement.

**PROMISE TO PAY.** For value received, receipt of which is hereby acknowledged, on or before the Maturity Date, the Borrower promises to pay the principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) or such lesser amount as shall have been advanced by Lender, from time to time, to or on behalf of Borrower under this Agreement, and all interest and any other charges, including service charges, to the order of Lender at its office at the address noted above or at such other place as Lender may designate in writing. The Borrower will make all payments in lawful money of the United States of America.

**PAYMENT SCHEDULE.** This Agreement will be paid according to the following required payment schedule: Beginning on November 8, 2009, monthly payments of accrued and unpaid interest. The unpaid principal balance of this Note, together with all accrued interest and charges owing in connection therewith, shall be due and payable on the Maturity Date. All payments received by the Lender from the Borrower for application to the Line of Credit may be applied to the Borrower's obligations under the Line of Credit in such order as determined by the Lender.

**INTEREST RATE AND SCHEDULED PAYMENT CHANGES.** The initial variable interest rate on this Agreement will be 5.000% per annum. This interest rate may change on October 9, 2009, and every day thereafter. Each date on which the interest rate may change is called the "Change Date." Beginning with the first Change Date, Lender will calculate the new interest rate based on Prime Rate as published in the Wall Street Journal in effect on the Change Date (the "Index") plus 1.000 percentage points (the "Margin"). If the Index is not available at that time, Lender will choose a new Index which is based on comparable information. The Index is used solely to establish a base from which the actual rate of interest payable under this Agreement will be calculated, and is not a reference to any actual rate of interest charged by any lender to any particular borrower. The interest rate will never increase or decrease on any Change Date by more than 2.000 percentage points from the rate applicable in the preceding period. The interest rate will never be greater than 24.000% or less than 5.000%.

Nothing contained herein shall be construed as to require the Borrower to pay interest at a greater rate than the maximum allowed by law. If, however, from any circumstances, Borrower pays interest at a greater rate than the maximum allowed by law, the obligation to be fulfilled will be reduced to an amount computed at the highest rate of interest permissible under applicable law and if, for any reason whatsoever, Lender ever receives interest in an amount which would be deemed unlawful under applicable law, such interest shall be automatically applied to amounts owed, in Lender's sole discretion, or as otherwise allowed by applicable law. An increase in the interest rates will result in a higher payment amount. Interest on this Agreement is calculated on a 365/360 day basis. The unpaid balance of this loan after Maturity, whether by acceleration or otherwise, shall be subject to a post-maturity rate of interest equal to 5.000 percentage points over the applicable variable interest rate in effect from time to time, calculated as described above in the section "Interest Rate."

**LATE PAYMENT CHARGE.** If any required payment is more than 10 days late, then at Lender's option, Lender will assess a late payment charge of 5.000% of the amount past due, subject to a maximum charge of $250.00.

**LINE OF CREDIT TERMS.** At any time prior to the Maturity Date, the Borrower and Lender agree that the Borrower may request an advance under this Agreement up to a maximum amount equal to the Line of Credit Limit if before and after the request:

- The outstanding borrowings under this Agreement are not in excess of the Line of Credit Limit.
- An Event of Default does not exist
- The Lender is not precluded by law from making the advance.

**Advances.**

- Advances under this Agreement may only be requested in writing by the Borrower or by an authorized person.
- The total of all advances requested and unpaid principal cannot exceed Five Hundred Thousand and 00/100 Dollars ($500,000.00).





- All advances made will be charged to a loan account in Borrower's name on Lender's books, and the Lender shall debit such account the amount of each advance made to, and credit to such account the amount of each repayment made by Borrower.

**Suspension and Termination.** Advances under this Agreement will be available until the earlier to occur of (a) October 8, 2010; (b) the date the Line of Credit is cancelled by Borrower; or (c) the date the Line of Credit is cancelled by the Lender due to an occurrence of an Event of Default (the "Draw Expiration Date") From and after the Draw Expiration Date, no further advances will be made available to Borrower. The date this Line of Credit expires is on the earlier to occur of (a) October 8, 2010; (b) the date the Line of Credit is cancelled by Borrower; or (c) the date the Line of Credit is cancelled by the Lender due to an occurrence of an Event of Default (the "Maturity Date").

**GUARANTY.** In support of this transaction, a Guaranty dated October 8, 2009 has been executed by Andrews Sports Medicine and Orthopaedic Center, LLC; a Guaranty dated October 8, 2009 has been executed by E Lyle Cain Jr.; and a Guaranty dated October 8, 2009 has been executed by Jeffrey R Dugas .

**RIGHT OF SET-OFF.** To the extent permitted by law, Borrower agrees that Lender has the right to set-off any amount due and payable under this Agreement, whether matured or unmatured, against any amount owing by Lender to Borrower including any or all of Borrower's accounts with Lender. This shall include all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. Such right of set-off may be exercised by Lender against Borrower or against any assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor of Borrower, or against anyone else claiming through or against Borrower of such assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off has not been exercised by Lender prior to the making, filing or issuance or service upon Lender of, or of notice of, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena or order or warrant.

**DEFAULT.** Upon the occurrence of any one of the following events (each, an "Event of Default" or "default" or "event of default"), Lender's obligations, if any, to make any advances will, at Lender's option, immediately terminate and Lender, at its option, may declare all indebtedness of Borrower to Lender under this Agreement to be immediately due and payable without further notice of any kind notwithstanding anything to the contrary in this Agreement or any other agreement: (a) Borrower's failure to make any payment on time or in the amount due; (b) any default by Borrower under the terms of this Agreement or any other agreement, security agreement executed in connection with this Agreement (individually, a "Loan Document" and collectively, the "Loan Documents"); (c) any default by Borrower under the terms of any other note, loan agreement, security agreement, mortgage or other document in favor of Lender; (d) the death, dissolution, or termination of existence of Borrower or any guarantor; (e) Borrower is not paying Borrower's debts as such debts become due; (f) the commencement of any proceeding under bankruptcy or insolvency laws by or against Borrower or any guarantor or the appointment of a receiver; (g) any default under the terms of any other indebtedness of Borrower to any other creditor; (h) any writ of attachment, garnishment, execution, tax lien or similar instrument is issued against any collateral securing the loan, if any, or any of Borrower's property or any judgment is entered against Borrower or any guarantor; (i) any part of Borrower's business is sold to or merged with any other business, individual, or entity; (j) any representation or warranty made by Borrower to Lender in any of the Loan Documents or any financial statement delivered to Lender proves to have been false in any material respect as of the time when made or given; (k) if any guarantor, or any other party to any agreement or instrument with or in favor of Lender entered into or delivered in connection with the Loan terminates, attempts to terminate or defaults under any such agreement or instrument; (l) Lender has deemed itself insecure or there has been a material adverse change of condition of the financial prospects of Borrower or any collateral securing the obligations owing to Lender by Borrower. Upon the occurrence of an event of default, Lender may pursue any remedy available under any Related Document, at law or in equity.

**RELATED DOCUMENTS.** If this Agreement is secured by a security agreement, mortgage, deed of trust, trust deed, security deed or loan agreement of even or previous date, it is subject to all the terms thereof.

**GENERAL WAIVERS.** To the extent permitted by law, the Borrower severally waives any required notice of presentment, demand, acceleration, intent to accelerate, protest and any other notice and defense due to extensions of time or other indulgence by Lender or to any substitution or release of collateral. No failure or delay on the part of Lender, and no course of dealing between Borrower and Lender, shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

**JOINT AND SEVERAL LIABILITY.** If permitted by law, each Borrower executing this Agreement is jointly and severally bound.

**SEVERABILITY.** If a court of competent jurisdiction determines any term or provision of this Agreement is invalid or prohibited by applicable law, that term or provision will be ineffective to the extent required. Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Agreement without invalidating the remainder of either the affected provision or this Agreement.

**SURVIVAL.** The rights and privileges of the Lender hereunder shall inure to the benefits of its successors and assigns, and this Agreement shall be binding on all heirs, executors, administrators, assigns and successors of Borrower.

**ASSIGNABILITY.** Lender may assign, pledge or otherwise transfer this Agreement or any of its rights and powers under this Agreement without notice, with all or any of the obligations owing to Lender by Borrower, and in such event the assignee shall have the same rights as if originally named herein in place of Lender. Borrower may not assign this Agreement or any benefit accruing to it hereunder without the express written consent of the Lender.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**GOVERNING LAW.** This Agreement is governed by the laws of the state of Alabama except to the extent that federal law controls.

**HEADING AND GENDER.** The headings preceding text in this Agreement are for general convenience in identifying subject matter, but have no limiting impact on the text which follows any particular heading. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.

© 2004-2009 Compliance Systems, Inc. fdce860d-a3b733ba - 2009.05.253
Commercial Line of Credit Agreement and Note - DL4006

www.compliancesystems.com

  

**ATTORNEYS' FEES AND OTHER COSTS.** If legal proceedings are instituted to enforce the terms of this Agreement, Borrower agrees to pay all costs of the Lender in connection therewith, including reasonable attorneys' fees, to the extent permitted by law.

**By signing this Agreement, Borrower acknowledges reading, understanding, and agreeing to all its provisions. CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

_____     10/8/09
John W Cory                          Date
Individually

© 2004-2009 Compliance Systems, Inc. fdce860d-a3b7333a - 2009.05.253
Commercial Line of Credit Agreement and Note - DL4006

www.compliancesystems.com





**EXHIBIT D**

STATE OF ALABAMA          )
                         )
COUNTY OF JEFFERSON       )

### ASSIGNMENT OF LOAN DOCUMENTS

**FOR VALUE RECEIVED**, the undersigned, **OAKWORTH CAPITAL BANK,** an Alabama state banking corporation (the "Assignor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, in hand paid to Assignor by **ANDREWS SPORTS MEDICINE AND ORTHOPAEDIC CENTER, LLC**, an Alabama limited liability company (the "Assignee"), the receipt of which is hereby acknowledged, does hereby assign, transfer and deliver unto the Assignee, its successors and assigns, **WITHOUT RECOURSE, WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR BY OPERATION OF LAW OF ANY KIND OR NATURE WHATSOEVER**, all of Assignor's right, title and interest in and to the documents set forth on the attached Exhibit "A" (hereinafter referred to as the "Loan Documents") and the rights of Assignor thereunder.

**IN WITNESS WHEREOF,** the Assignor has caused this Assignment to be executed by its duly authorized representative this 27th day of October 2010.


ASSIGNOR:

OAKWORTH CAPITAL

By: _____

Print Name: _Forest W. Whatley, Jr._

Its: _Managing Director - Pres't_


1