FILED
2014 Sep-16  AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| ANDREWS SPORTS MEDICINE & ORTHOPAEDIC CENTER, LLC, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) ) | Case Number: 2:11-cv-04088-JHE |
| JOHN WARD CORY, M.D., | ) ) | |
| Defendant/Counterclaim Plaintiff /Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) | |
| JAMES ANDREWS, M.D., E. LYLE CAIN, M.D., JEFFREY R. DUGAS, M.D., STEVEN R. NICHOLS, M.D., | ) ) ) ) | |
| Third-Party Defendants | ) ) | |

.

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff Andrews Sports Medicine & Orthopaedic Center, LLC ("ASMOC") initiated this action against Defendant John Ward Cory, M.D. ("Dr. Cory") alleging state law claims for breach of an employment agreement, breach of a credit agreement, and unjust enrichment.  (Doc. 1).   Dr. Cory asserts counterclaims against ASMOC and third-party claims against James R. Andrews, M.D. ("Dr. Andrews"), E. Lyle Cain, M.D. ("Dr. Cain"), Jeffry R. Dugas, M.D. ("Dr. Dugas"), and Steven R. Nichols, M.D. ("Dr. Nichols") (collectively referred to as the "ASMOC Doctors") seeking a declaratory judgment and alleging state law claims for fraudulent inducement, promissory fraud, breach of contract, breach of implied contract, intentional interference with contractual and/or business relationships, promissory estoppel, equitable estoppel, and conspiracy.  (Doc. 17).   ASMOC and the ASMOC Doctors (collectively,

"Movants") move to dismiss the counterclaims and third-party claims asserted against them. (Doc. 18).  Dr. Cory has submitted a response in opposition to the motion.  (Doc. 19).  The motion is fully briefed and ripe for review.[1]  For the reasons stated below, the undersigned recommends the motion to dismiss, (doc. 18), be **DENIED** as to Counts I-V and VII-IX and **GRANTED** as to Count VI.

## I. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief."  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 557).

Fraud claims must be pled more specifically pursuant to Federal Rule of Civil Procedure 9(b):  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  As the Eleventh Circuit has explained,

> Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person

---

[1] Because the undersigned did not believe a hearing would aid in resolving the issues presented in the motion, he denied Movants' motion for a hearing on May 19, 2014. (Doc. 23).

responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997).   "[I]t is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent."   *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted.   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).   A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* (citation omitted).   The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully."   *Id.*; *see also Bell Atl. Corp.*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Iqbal*, 556 U.S. at 679.

## II. Factual Background

### A.  The Complaint and Relevant Provisions of the Employment Agreement[2]

The original complaint alleges that on September 8, 2009, ASMOC and Dr. Cory entered

into an Employment Agreement.  (Doc. 1 at 2).  The initial term of the agreement was for one

year and provided for automatic renewal at the end of each term, unless terminated by either

party.  (*Id.*).  According to the agreement, Dr. Cory was an employee of ASMOC and was not

guaranteed employment past the initial term or eventual membership in ASMOC.  (*Id.*).  Under

the agreement, as compensation for his employment, Dr. Cory would be paid a sum each month

equal to the amount of money he earned for the company, minus his share of expenses, which

was referred to as his "Net Production."   (Doc. 1 at 11).   The applicable portion of the

Employment Agreement provides as follows:

> 4.1 The Employee shall be entitled to receive compensation each month in an
> amount equal to the excess of the Employee's Allocable Share of Revenues for
> such month over the Employee's Allocable Share of Expenses for such month,
> such excess being hereinafter referred to as "*Net Production*."  The Employee's
> Allocable Share of Revenues and Allocable Share of Expenses shall be
> determined by the Company in accordance with the following guidelines:
>
> (a) The Employee's Allocable Share of Revenues shall consist of the
> collections, during the applicable period of the Employee's employment with the
> Company, of the accounts receivable of the Company directly attributable to the
> Employee's personally performed services, services furnished incident to those
> personally performed services, and ancillary medical services provided to the
> Employee's patients, excluding revenues from any designated health services not
> personally performed by the Employee or not furnished incident to those services,
> reduced by any discounts, claims, refunds, chargebacks or other appropriate
> reductions which have or will diminish such revenues, together with such
> additional revenues of the Company reasonably allocated to the Employee by the

---

[2] Although the motion to dismiss is directed to the Amended Counterclaim/Third Party
Complaint, the allegations in the original Complaint and the provisions of the Employment
Agreement are helpful in understanding nature of the case. The Employment Agreement,
although extrinsic to the pleadings, may be considered because "it is (1) central to the . . . claim,
and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600
F.3d 1334, 1337 (11th Cir. 2010).

Company during the Employee's employment with the Company, all as determined by the Company each calendar month in a manner reasonably applied on a consistent basis to the Company's physician employees.

> (b) The Employee's Allocable Share of Expenses shall consist of the sum of the following:
>
>> (i)   The Employee's share of the general, operating, and administrative overhead expenses of the Company; and
>>
>> (ii)  All expenses specifically attributable to or paid on behalf of the Employee (including the compensation of the Employee received from the Company, benefits, malpractice, health, disability and other insurance, and expense reimbursement), all as reasonably determined by the Company.

(Doc. 18 at 21 (Ex. A at 3)) (emphasis in original). The agreement also specifically provides if Dr. Cory's Net Production for any month was in the negative, he would be obligated to pay that sum to the company. (Doc. 18 at 21-22 (Ex. A at 3-4)).

The Employment Agreement also contains a merger clause, which states:

> Entire Agreement. This Agreement constitutes the entire agreement between the parties and replaces, supersedes and cancels any and all employment agreements, deferred compensation agreements, or employment arrangements, whether written or oral, between the parties hereto, made at any time prior to the date hereof.

(Doc. 18 at 27 (Ex. A at 9)).

Pursuant to Schedule 4.3 of the Employment Agreement, ASMOC agreed to assist Dr. Cory in establishing a line of credit at a mutually agreeable financial institution to provide Dr. Cory advances against his future earnings. (Doc. 1 at 3). The line of credit was established at Oakworth Capital Bank ("Oakworth") in the principal amount of $500,000.00 (the "credit line"). (*Id.*). Oakworth required ASMOC and two of its members to guarantee the credit line to extend credit to Dr. Cory. (*Id.*). The note matured on October 8, 2010. (*Id.*). To avoid the loan becoming past due and possibly harming ASMOC as guarantor, on October 27, 2010, ASMOC

purchased Dr. Cory's loan from Oakworth, and ASMOC became the owner of Dr. Cory's debt. (*Id.*).

ASMOC alleges Dr. Cory has refused to make payment of the amounts due under the loan, $193,024.47, plus interest and costs, and asserts claims against Dr. Cory for breach of the employment agreement (Count One), breach of the credit agreement (Count Two), and unjust enrichment (Count Three).  (Doc. 1).

### B.  The Amended Counterclaim and Third Party Complaint[3]

Dr. Cory is a board-certified orthopaedic physician and surgeon who graduated from the Wake Forest School of Medicine in 1997.  (Doc. 17 at ¶ 1).  After graduating from medical school, Dr. Cory completed his orthopaedic surgery residency and fellowship at the University of South Carolina in 2003.  (*Id.*)  Dr. Cory then completed a fellowship in sports medicine foot and ankle surgery at the American Sports Medical Institute (the non-profit arm of ASMOC's prior business – Alabama Sports Medicine and Orthopaedic Center) in Alabama.  (*Id.*)  Dr. Cory later specialized in the practice of orthopaedic medicine in Utah, where he served as the Director of Northern Utah Sports, Foot and Ankle Center for several years.  (*Id.*)

In 2007, Dr. Cory moved to Phoenix, Arizona to develop a full orthopaedic medicine practice, which he did with the Phoenix Orthopaedic Group, a multi-physician practice comprised exclusively of orthopaedic doctors and surgeons.  (Doc. 17 at ¶ 2).  Dr. Cory's practice and business quickly escalated and became very successful, earning him well in excess

---

[3] "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)).  Therefore, the following "facts" are taken directly from the Amended Counterclaim and Third-Party Complaint. (*See* doc. 17).

of $500,000 annually by the end of 2008.  (*Id.*)   The Amended Counterclaim/Third Party Complaint alleges Cory earned a reputation as an outstanding orthopaedic doctor.  (*Id.*)

In 2008, Dr. Angus McBryde, who formerly served as ASMOC's Fellowship Director for Foot and Ankle Surgery, announced his intention to retire.  (Doc. 17 at ¶ 13).  Dr. McBryde was responsible for managing ASMOC's fellows, relatively new physicians seeking to specialize in foot and ankle surgery,  and for treating general orthopaedic patients who came to ASMOC and were assigned to him if he was the next available physician in the rotation.  (Doc. 17 at ¶ 11).

ASMOC and Drs. James R. Andrews, E. Lyle Cain, and Jeffrey R. Dugas knew of Dr. Cory's work and reputation, and in early 2009, Mike Immel, ASMOC's manager and chief financial officer, contacted Dr. Cory to see if he would be interested in working for ASMOC. (Doc. 17 at ¶ 15).   Immel represented that ASMOC was seeking someone to take over Dr. McBryde's practice and to serve as Fellowship Director for Foot and Ankle Surgery.  (*Id.*)  A January 26, 2009 email from Immel's assistant to ASMOC's insurance broker confirmed the purpose of the contact with Dr. Cory was to solicit "a surgeon to take over Dr. McBryde's practice." (*Id.*)

Dr. Cory was initially reluctant to give up his practice and move his family, but he agreed to visit ASMOC's facilities and discuss the opportunity in more detail.  (Doc. 17 at ¶ 16).  On January 26, 2009, Dr. Cory visited ASMOC's facilities to discuss the potential job opportunity. (Doc. 17 at ¶ 17).  During the visit, Drs. Andrews, Cain, Dugas, and Nichols, as well as Immel, asked Dr. Cory to come work for ASMOC as an orthopaedic doctor and as Fellowship Director for Foot and Ankle Surgery.  (*Id.*)  Each of these individuals also specifically represented to Dr. Cory that if he came to work for ASMOC, he would take over Dr. McBryde's practice because he was retiring.  (*Id.*)  These representations were particularly important to Dr. Cory because

they ensured that if he decided to give up his practice in Arizona, he had a built-in patient base, the Fellowship Director position, and the revenue that both generated.  (*Id.*)

During the January 26, 2009 visit, Immel also presented Dr. Cory with financial statements and information related to ASMOC, including a chart showing Dr. McBryde's revenue and costs for 2008 (including the allocation of overhead expenses).  (Doc. 17 at ¶ 18).  The financial information revealed that Dr. McBryde generated over $1.3 million in gross revenue in 2008 from his work as the Fellowship Director, and Immel represented to Dr. Cory those numbers represented a "down year" and that he could expect to earn even more.  (*Id.*)  The financial information is not publicly available and therefore could not be independently verified.  (*Id.*)

During the January 26 visit, Dr. Cory explained to the doctors at ASMOC he prescribed and sold durable medical equipment ("DME") to his orthopaedic patients as part of his practice in Arizona and he wanted to continue doing so if he joined ASMOC.  (Doc. 17 at ¶ 19).  In response, Drs. Andrews, Cain, Dugas, and Nichols assured Dr. Cory (1) neither they nor ASMOC would interfere with his prescription and sale of DME if he came to ASMOC; ASMOC's doctors and employees would promote and assist Dr. Cory's prescription and sale of DME; and (3) Dr. Cory would continue to receive the same per diem for the sale of DME he was receiving from his Arizona practice.  (*Id.*)

In February 2009, Dr. Cory and Immel spoke on the phone, and during that conversation, Immel again assured Dr. Cory if he came to work for ASMOC, he would take over Dr. McBryde's practice, including serving as the Fellowship Director and treating his share of general patients.  (Doc. 17 at ¶ 20).  Immel also confirmed during the telephone call the financial

information he had shown Dr. Cory was accurate and reiterated that it reflected a "down year." (*Id.*)

In March 2009, Dr. Cory had a telephone conference call with Immel and Drs. Andrews, Cain, Dugas, and McBryde.  (Doc. 17 at ¶ 22).  During the call, Immel and Drs. Andrews, Cain, and Dugas represented to Dr. Cory (1) Dr. McBryde was overwhelmed with patients; (2) they needed Dr. Cory to come to ASMOC to treat the backlog of patients and take over Dr. McBryde's practice because of the patient load and upcoming retirement; (3) ASMOC had a substantial patient base for which Dr. Cory would serve as the treating physician as soon as he arrived at ASMOC; and (4) Dr. Cory would receive a proportionate share of the general, unassigned ASMOC patients regardless of what type of treatment they needed.  (*Id.*).  When Dr. Cory asked for further assurances he would have patients immediately if he joined ASMOC, Immel and Drs. Andrews, Cain, and Dugas assured him (1) Dr. McBryde was six months behind on treating patients; (2) they needed Dr. Cory to catch the practice up on Dr. McBryde's patients (which was straining ASMOC's staff and resources at the time) by treating those patients; and (3) Dr. Cory was being hired for the specific purpose of taking over Dr. McBryde's practice. (Doc. 17 at ¶ 23).

Also during the March 2009 call, Drs. Andrews, Cain, and Dugas each represented to Dr. Cory that if he came to work for ASMOC, any unassigned patients would be assigned to him on a rotating basis.  (Doc. 17 at ¶ 24).  There were no discussions during that call or at any other time between Dr. Cory and anyone at ASMOC regarding any limitations on Dr. Cory's ability to practice all areas of orthopaedic medicine.  (*Id.*).  During the March 2009 call, Dr. Cory told the other participants he would not accept the job unless he would be Fellowship Director, take over McBryde's practice, be allowed to practice in all areas, receive his share of general, unassigned

patients, and prescribe and sell DME in the same manner he had in Arizona. (Doc. 17 at ¶ 25). Immel and Drs. Andrews, Cain, Dugas, and Nichols agreed these conditions would be met. (*Id.*)

In reliance on the representations made to him during the January visit and the February and March telephone calls, Dr. Cory executed the Employment Agreement with ASMOC on September 8, 2009. (Doc. 17 at ¶ 26). Dr. Cory alleges ASMOC breached the Employment Agreement by (1) improperly allocating charges for casting employees, casting materials, and employee time; (2) allocating the full amount of overhead expenses to him in his first year even though ASMOC did not do that with other new physicians; (3) attempting to limit Dr. Cory's medical practice; (4) requiring him to employ two full-time assistants he did not need; and (5) not paying his moving expenses to Birmingham. (Doc. 17 at ¶¶ 28-33). Dr. Cory further contends he executed and used the line of credit from Oakworth based on the representations made to him during the recruitment process. (Doc. 17 at ¶ 35).

After Dr. Cory began working for ASMOC, he discovered (1) Dr. McBryde was not retiring (at the direction of ASMOC and Drs. Andrews, Cain, Dugas and Nichols); (2) Dr. Cory would not be taking over Dr. McBryde's practice of Fellowship Director position; (3) Dr. Cory would not allowed to treat any general, unassigned patients; and (4) Dr. Cory would not be permitted to sell DME. (Doc. 17 at ¶ 36-37, 45). Dr. Cory discussed these problems with Immel in December 2009 and on several occasions in January through April 2010. (Doc. 17 at ¶ 40). Immel told him he could not do "cases [ASMOC] built its reputation on," meaning anything other than foot and ankle cases (although Dr. Cory was being excluded from those as well). (*Id.*). Dr. Cory also expressed concerns to Drs. Cain and Dugas in a March 2010 telephone call and was once again told he could not handle other types of cases and he would not be taking over

10

for Dr. McBryde or getting general, unassigned patients.  (Doc. 17 at ¶ 41).  In April 2010, Dr. Cory terminated the Employment Agreement and moved back to Arizona.  (Doc. 17 at ¶ 47).

### C.  Procedural History

Dr. Cory filed an Answer and Counterclaim on February 24, 2012.  (Doc. 5).  Following an order from the court noting Drs. Andrews, Cain, Dugas, and Nichols were non-parties and could therefore not be counterclaim defendants, Dr. Cory filed a Counterclaim against ASMOC and a Third-Party Complaint against Drs. Andrews, Cain, Dugas, and Nichols.  (Doc. 10).  ASMOC and the ASMOC Doctors moved to dismiss it.  (Doc. 12).  The magistrate judge to whom this case was previously assigned held some of Dr. Cory's claims were not pled with adequate specificity and gave Dr. Cory twenty-one days to replead his claims.  (Doc. 16).  Dr. Cory filed his Amended Counterclaim and Third-Party Complaint on March 14, 2013.  (Doc. 18).

In the Amended Counterclaim and Third-Party Complaint, Dr. Cory makes claims for (1) declaratory judgment (against ASMOC and the ASMOC Doctors); (2) fraudulent inducement (against ASMOC and the ASMOC Doctors); (3) promissory fraud (against ASMOC); (4) breach of contract (against ASMOC); (5) breach of implied contract (against the ASMOC Doctors); (6) intentional interference with existing and potential business/contractual relationships (against the ASMOC Doctors); (7) promissory estoppel (against ASMOC and the ASMOC Doctors); (8) equitable estoppel (against ASMOC and the ASMOC Doctors) and (9) conspiracy (against ASMOC and the ASMOC Doctors).

### III. Analysis

Movants move to dismiss Dr. Cory's claims on the following grounds:  (1) Dr. Cory's fraud-based claims (Counts I, II, III, VII, and VIII) should be dismissed because he did not

"reasonably rely" on representations made to him by Movants and failed to meet the pleading standard under Fed. R. Civ. P. 9(b); (2) Dr. Cory's breach of contract claim (Count IV) should be dismissed because a plain reading of the Employment Agreement indicates there was no breach by ASMOC; (3) Dr. Cory's breach of implied contract claim (Count V) should be dismissed because he has failed to allege an implied contract exists between Dr. Cory and the ASMOC Doctors; (4) Dr. Cory's intentional interference with existing and potential business/contractual relationships claim (Count VI) should be dismissed for failure to allege a *prima face* case; and (5) Dr. Cory's conspiracy claim (Count IX) is due to be dismissed because the underlying claims are due to be dismissed.   (*See* doc. 18.)

### A.  Dr. Cory's Fraud-Based Claims

#### 1.  Reasonable Reliance

Movants argue Dr. Cory's fraud-based claims (those for declaratory judgment, fraudulent inducement, promissory fraud, promissory estoppel, and equitable estoppel) should be dismissed because Dr. Cory's reliance on any representations made by Movants outside the confines of the Employment Agreement was unreasonable as a matter of law.   (Doc. 18 at 3-6).  They contend Dr. Cory is a sophisticated party represented in the Employment Agreement negotiations by attorneys and accountants and he therefore could not rely on representations not included in the Employment Agreement, which contains a merger clause stating the Employment Agreement supersedes and cancels any other oral or written agreements between the parties.  (*Id.*).  Dr. Cory argues a merger clause does not preclude his fraud claims or have any bearing on whether he reasonably relied upon false statements made by Movants.  (Doc. 19 at 10-12).

In Alabama, a plaintiff alleging fraud must prove "reasonable reliance" on a misrepresentation by the defendant. *See Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala.

1997).  Reasonable reliance is determined "based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties."  *Id.*  There is no reasonable reliance where "evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms."  *Id.*

A merger or integration clause in a contract does not preclude evidence of a fraud claim, such as fraud in the inducement or procurement of a contract.  *Envtl. Sys., Inc. v. Rexham Corp.*, 624 So. 2d 1379, 1383 (Ala. 1993) ("An integration, or merger, clause is a portion of a particular contract that restates the rationale of the parol evidence rule within the terms of the contract . . . [and] therefore, is [] not applicable to exclude evidence relating to a fraud claim.") (internal citations omitted).  To hold otherwise, the court noted, would encourage deliberate fraud.  *Id.* (citing *Downs v. Wallace*, 622 So. 2d 337, 342 (Ala. 1993)); *see also Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp. 2d 1261, 1273 (N.D. Ala. 2013) ("[C]ommonplace merger clauses are insufficient to put a party on notice of fraud because they generally do not directly contradict any representations that were made.").

Considering all the circumstances surrounding the transaction at issue, and given the merger clause in the Employment Agreement does not bar Dr. Cory's fraud claims, Counts I, II, III, VII, and VIII of Dr. Cory's Amended Counterclaim and Third-Party Complaint are facially plausible and state a claim upon which relief can be granted.  The Employment Agreement is silent regarding the alleged misrepresentations and therefore does not contradict any of the oral representations that were made to Dr. Cory.  *See Sirmon*, 922 F. Supp. 2d at 1273.  And although there appears to be no disparity in mental capacity, educational background, relative

sophistication, and/or bargaining power of the parties, given the totality of the circumstances surrounding the transaction, Dr. Cory has alleged facts sufficient to allow the court to draw reasonable inferences that (1) Dr. Cory reasonably relied upon Movants' representations he would take over Dr. McBryde's practice, become the Fellowship Director, be able to treat his share of general patients, and sell DME as he had done in Arizona; and (2) those representations induced him to leave his practice in Arizona, sign the Employment Agreement, and go to work for ASMOC.  Accordingly, Dr. Cory has sufficiently stated a claim under Federal Rule of Civil Procedure 12(b)(6) with respect to Counts I, II, III, VII, and VIII.

### 2.  Sufficiency under Fed. R. Civ. P. 9(b)

Movants contend that Dr. Cory's Amendment Counterclaim and Third-Party Complaint is insufficiently pled under Fed. R. Civ. P. 9(b) because it effectively contains the impermissible "group pleading"[4] against "all defendants" that the first Counterclaim and Third-Party Complaint did.  (Doc. 18 at 7-8).

To satisfy the requirements of Rule 9(b), a complaint must allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba*, 256 F.3d at 1202 (quoting *Brooks*, 116 F.3d at 1371).  "Courts should be aware

---

[4] Because this is not a securities fraud action, the group pleading doctrine is inapplicable. *See Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004) (*quoting Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987)).  *See also Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004) (discussing the "group pleading" or "group published" doctrine); *In re Cabletron Systems, Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) ("This circuit has recognized a very limited version of the group pleading doctrine for securities fraud").

that 'application of Rule 9(b) . . . must not abrogate the concept of notice pleading," but the "particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'" *Centennial Bank v. Noah Grp., LLC*, 445 F. App'x 277, 279 (11th Cir. 2011) (quoting *Durham v. Bus. Mgmt. Assocs.,* 847 F.2d 1505, 1511–12 (11th Cir.1988)).

Dr. Cory's Amended Counterclaim and Third-Party Complaint satisfies the pleading requirements under Rule 9(b). Unlike the initial Counterclaim and Third-Party Complaint, the Amended Counterclaim and Third-Party Complaint states with particularity (1) the oral representations made by either an ASMOC Doctor or Immel (e.g., that he would take over Dr. McBryde's practice, become Fellowship Director, be assigned his share of general patients, and be permitted to sell DME); (2) the time and place of those statements (e.g., during Dr. Cory's visit to ASMOC on January 26, 2009 or during telephone calls in February or March 2009); (3) the content and manner in which the representations misled Dr. Cory (e.g., Dr. Cory was led to believe that he would take over Dr. McBryde's practice, be the Fellowship Director, be assigned his share of general patients, and be permitted to sell DME if he came to work for ASMOC); and (4) what ASMOC and the ASMOC Doctors obtained as a consequence of the fraud (e.g., Dr. Cory left his practice in Arizona and came to work for ASMOC).

The fact that more than one ASMOC Doctor allegedly made the same misrepresentations to Dr. Cory during the course of his visit and the follow-up conference call does not render his Amended Counterclaim and Third-Party Complaint insufficient under Rule 9(b). *See Am. Res. Ins. Co., Inc. v. Warrantech Auto.*, No. 07-0850-WS-M, 2008 WL 1818922, at *4 (S.D. Ala. April 21, 2008) (following grant of a motion for more definite statement based on allegations

against all defendants generally, court denied a motion to dismiss based on Rule 9(b) where same misrepresentations were attributed to each defendant individually); *Am. Res. Ins. Co., Inc. v. The Evoleno Co., LLC*, No. 07-0035-WS-M, 2007 WL 8082473, at *4 (S.D. Ala. July 30, 2007) (granting motion for more definite statement).  The allegations in the Amended Counterclaim and Third-Party Complaint are specific to the parties who allegedly made the statements.  For example, Dr. Cory does not allege that Dr. Nichols was on the March 2009 conference call, and he alleges Dr. McBryde was on the call, but unlike Drs. Andrews, Cain, and Dugas, Dr. McBryde made no representations regarding Dr. Cory's potential employment with ASMOC. (Doc. 17 at 12-15).  The allegations, although repetitive, are tailored to each defendant and his particular misrepresentation.

Unlike his initial Counterclaim and Third-Party Complaint, Dr. Cory's Amended Counterclaim and Third-Party Complaint alerts defendants to the precise misconduct with which they are charged and contains the specificity required by Rule 9(b).  Accordingly, the motion to dismiss the Amended Counterclaim and Third-Party Complaint on Rule 9(b) grounds is due to be denied.

**B.  Dr. Cory's Breach of Contract Claim**

Movants also move to dismiss Dr. Cory's breach of contract claim (Count IV) because "upon a plain reading of the Employment Agreement, it is clear that the actions taken by Andrews Sports (as pled by Dr. Cory) that Dr. Cory alleges constitute breaches of the Employment Agreement, are allowed and fully in accordance with the terms of the Employment Agreement."  (Doc. 18 at 8).

To sustain a breach of contract claim under Alabama law, a plaintiff must allege "(1) the existence of a valid contract binding the parties in the action, (2) [his] own performance under

the contract, (3) the defendant's nonperformance, and (4) damages." *Intersport, Inc. v. T-Town Tickets LLC*, 896 F. Supp. 2d 1106, 1113 (N.D. Ala. 2012) (quoting *Ex parte Am. Heritage Life Ins. Co.,* 46 So.3d 474, 477 (Ala.2010)); *see also Grayson Inc. v. Global Payments Direct, Inc.*, No. 13-CV-1256, 2013 WL 5719087, at *3 (N.D. Ala. Oct. 18, 2013).

Dr. Cory has alleged (1) the existence of a valid binding contract between him and ASMOC, specifically, the Employment Agreement; (2) his own performance under the Employment Agreement because he began working for ASMOC according to its terms; (3) ASMOC's failure to perform under paragraph 4 of the Employment Agreement, which requires Dr. Cory to pay only his "allocable share" of overhead expenses, and paragraph 23 of the Employment Agreement, which prohibits ASMOC from controlling Dr. Cory's medical practice; and (4) Dr. Cory was damaged because he gave up a lucrative practice in Arizona to work at ASMOC, but ASMOC's breach of the Employment Agreement kept him from earning the revenue to which he was entitled.  (Doc. 17 at 105-29).

Movants essentially seek to have this Court interpret the provisions of the Employment Agreement at the motion to dismiss stage.  To do so is not appropriate at this point in the proceedings, and Movants have cited no case law suggesting the court should engage in such an inquiry.  *See Costine v. BAC Home Loans*, 946 F. Supp. 2d 1224, 1230 (N.D. Ala. 2013) (in deciding whether to dismiss a breach of contract claim, noting that "[t]he Court's sole task at this point in the litigation is to evaluate whether Plaintiffs' claim has satisfied the pleading standards").  Dr. Cory has adequately pled a facially plausible breach of contract claim allowing the court to draw the reasonable inference that ASMOC is liable for the breach.  *See Intersport, Inc.*, 896 F. Supp. 2d at 1113 (denying motion to dismiss where plaintiff adequately pled all four elements of breach of contract claim); *Grayson Inc.*, 2013 WL 5719087, at *3 (same).  *Cf.*

*Alabama Aircraft Indus., Inc. v. Boeing Co., Inc.*, No. 2:11-CV-3577-RDP, 2013 WL 1178720 (N.D. Ala. Mar. 20, 2013) (granting motion to dismiss where Plaintiff failed to identify contractual provision that was allegedly breached).  The motion to dismiss is therefore due to be denied with respect to the breach of contract claim (Count IV).

### C.  Dr. Cory's Implied Breach of Contract Claim

Movants also move to dismiss Dr. Cory's implied breach of contract claim (Count V) against the ASMOC Doctors, arguing he fails to allege the existence of an implied contract. (Doc. 18 at 12).  They contend Dr. Cory must specifically allege the existence of an offer, acceptance, consideration, or mutual assent to an implied contract.  (*Id.*).

To the contrary, Dr. Cory alleges the existence of a valid implied contract in his Amended Counterclaim and Third-Party Complaint.  (Doc. 17 at 136, 138, 141, 143, 144).  He alleges all of the required elements of a breach of implied contract claim (1) the existence of a valid, binding implied contract between him and the ASMOC Doctors, specifically, an agreement the ASMOC Doctors, who controlled the operations of management of ASMOC, would take the actions necessary to ensure that Dr. Cory would take over Dr. McBryde's practice and become the Fellowship Director in exchange for Dr. Cory's coming to work for ASMOC; (2) he performed his obligation under the implied contract by coming to work for ASMOC; (3) the ASMOC's Doctors failed to perform their obligation to ensure that Dr. Cory took over Dr. McBryde's practice and became the Fellowship Director; and (4) Dr. Cory was damaged because he gave up a lucrative practice in Arizona to work at ASMOC, but the ASMOC Doctors' breach of the implied contract kept him from earning the revenue to which he was entitled.  (Doc. 17 at 129-55).

Movants have cited no case law, and the court has found none, that Dr. Cory must specifically plead each element of a valid contract for his claim to survive a motion to dismiss.[5] Even if he had such a burden, however, the court may reasonably infer from the facts and circumstances pled in the Amended Counterclaim and Third-Party Complaint that even without an express promise, there was "a mutual intent to contract" between Dr. Cory and the ASMOC Doctors.  *See Madison Oslin, Inc. v. Interstate Res.*, No. 2:11-cv-01343, 2012 WL 4730877, at *12 (N.D. Ala. Sept. 30, 2012).  Dr. Cory's implied breach of contract claim (Count V) is therefore facially plausible, and the motion to dismiss the claim is due to be denied.

### D.  Dr. Cory's Intentional Interference with Existing and Potential Business and Contractual Relationships Claim

Movants also contend Dr. Cory has failed to state claims for intentional interference with existing and potential business and contractual relationships because, as an employee of ASMOC, he cannot allege Movants were strangers to any relevant relationships.  (Doc. 18 at 14). Dr. Cory maintains the relationship between him and his actual and potential patients is "a special one and involves not only medical treatment for the patient but also revenue specifically for Dr. Cory."  (Doc. 19 at 20).

The elements of a claim for intentional interference with a business relationship in Alabama are (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.  *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009).  The elements of a claim for intentional interference with a contractual relationship are the

---

[5] Moreover, Movants have not argued, and the court has not found case law to suggest, that such an implied contract could not exist.  *Cf. Willingham v. Global Payments, Inc.*, No. 1:12-CV-01157-RWS, 2013 WL 440702, at *21 (N.D. Ga. Feb. 5, 2013) (recommending an implied contract claim be dismissed where there could be no implied contract between the plaintiff and defendant).

same except that "'[a] claim of tortious interference with a contractual relationship presupposes the existence of an enforceable contract.'"  *Hope For Families & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1177 (M.D. Ala. 2010) (quoting *White Sands Grp., L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1054 (Ala. 2008)).

The Alabama Supreme Court has explained "a defendant is a party in interest to a business or contractual relationship if the defendant has any beneficial or economic interest in, or control over, that relationship."  *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1302-03 (11th Cir. 2010) (quoting *Tom's Foods, Inc. v. Carn,* 896 So. 2d 443, 454 (Ala. 2004) (internal quotation marks omitted)).  Courts have repeatedly held that a party is not a stranger to a contract or business relationship for purposes of the tort of interference where the defendant is involved in creating the relationship.  *Edwards*, 602 F.3d at 1303; *Hammonds v. Hyundai Motor Mfg. Alabama, LLC*, No. 2:10-CV-103-TFM, 2011 WL 2580168, at *10 (M.D. Ala. June 28, 2011); *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 455 (Ala. 2004)

For example, in *Edwards*, the Eleventh Circuit held that restaurant owners were not strangers to the business relationships between the restaurant's servers (their employees) and the servers' customers.  The court noted that

> Even though [the restaurant owners] should not interfere with tips that patrons give to employees of the restaurant, *see* 29 C.F.R. § 531.52 (2009) (requiring a customer's tipping of a server to be "free of any control by the employer"), they still exercise control over the employee-patron relationship through their management of the premises, the menu, and their employees' service to patrons. Like the defendants in *Tom's Foods,* [the restaurant owners] were essential parties to the business relationships . . . .  They were involved in creating those relationships; without them the plaintiffs would have had no relationship with the patrons of the restaurant or with their co-workers. . . . Without a restaurant there are no servers and no patrons to strike up a relationship.

602 F.3d at 1303.

In this case, the ASMOC Doctors are not strangers to the relationships between Dr. Cory

and any existing or potential patients he did or could have treated while working for ASMOC. As the owners and managers of ASMOC, the ASMOC Doctors were involved in creating the business relationships between Dr. Cory and his patients and exercised a substantial degree of control over the practice, just like the restaurant owners in *Edwards* controlled the restaurant environment.  Although a doctor-patient relationship differs from that of a restaurant server-customer relationship, the business aspect of the doctor-patient relationship is not sacrosanct, as Dr. Cory suggests.  (Doc. 19 at 20-21).  *See Ex parte Blue Cross & Blue Shield of Alabama*, 773 So. 2d 475, 480 (Ala. 2000) (insurance company was not stranger to relationship between dentist and patients).  All of the doctors in a practice have an economic interest in each other's business relationships with patients, even if they are not involved in each other's treatment decisions.  Dr. Cory's potential or existing relationships with ASMOC patients, whether they were former patients of Dr. McBryde's or general unassigned patients, would not exist at all without the ASMOC Doctors who own and control ASMOC.

The court cannot draw the reasonable inference that the ASMOC Doctors are liable for the misconduct alleged in Count VI because they are not strangers to the contractual and/or business relationships between Dr. Cory and his existing or potential ASMOC patients. Accordingly, because Dr. Cory has failed to make sufficient allegations regarding this essential element of this claim, the motion to dismiss should be granted with respect to Count VI.

**E.  Dr. Cory's Conspiracy Claim**

Movants also allege Dr. Cory's conspiracy claim (Count IX) should be dismissed because all of his other claims should be dismissed, and it would therefore lack a valid underlying cause of action.  (Doc. 18 at 15).  Given the undersigned's recommendations that most of Dr. Cory's claims should be allowed to proceed, dismissal of the conspiracy claim is improper at this time.

## IV. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** ASMOC and the ASMOC Doctors' motion to dismiss, (doc. 18), be **DENIED** as to Counts I-V (declaratory judgment, fraudulent inducement, promissory fraud, breach of contract, breach of implied contract) and Counts VII-IX (promissory estoppel, equitable estoppel, conspiracy) and **GRANTED** as to Count VI (intentional interference with existing and potential business/contractual relationships).

## V. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action. If objections are filed, the opposing party has ten (10) additional days to file a response to the objections.

DONE this 16th day of September 2014.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE